## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **WYOMING SAWMILLS, INC., a Wyoming corporation**, | ) ) | Case No. 07-861C |
| | ) | |
| Plaintiff, | ) | (Judge Braden) |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES**, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Scott W. Horngren
Haglund Kelley Horngren Jones &
Wilder LLP
101 SW Main, Suite 1800
Portland, OR  97204
Tele:  (503) 225-0777
Fax:  (503) 225-1257

June 30, 2009

# TABLE OF CONTENTS

I.      INTRODUCTION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BACKGROUND.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      The Fact That the Wabash Contract Is More than 10 Years Old Does
                Not Mean the Contract Is Not Entitled to MRCTA.. . . . . . . . . . . . . . . . 8

        B.      Alternatively, As Applied, the MRCTA Contract Provision Contains
                a Latent Ambiguity and Should be Construed Against Defendant.. . . . . . 14

        C.      Insect Activity on the Sale Area Does Not Affect the Interpretation
                of the Phrase "The Revised Contract Term May Not Exceed 10 Years
                as a Result of MRCTA," and it Was Not a Basis to Deny Wyoming
                Sawmills' 2007 Request for MRCTA. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.     CONCLUSION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

F:\SWH\J14680.wpd

## <u>TABLE OF AUTHORITIES</u>

FEDERAL CASES

Beta Constr. Co. v. United States, 39 Fed. Cl. 722 (1997), rev'd, 185 F.3d 884
(Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Big Chief Drilling Co. v. United States, 26 Cl. Ct. 1276, 1299 (1992). . . . . . . . . . . . . . . . . . . . . 16

Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 496-97 (1965). . . . . . . . . . . . . . . . . 15

Community Heating & Plumbing v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). . . . . . . . . . . . 15

Diggins Equip. Corp. v. United States, 17 Cl. Ct. 358, 360 (1989). . . . . . . . . . . . . . . . . . . . 1, 14, 16

Do-Well Machine Shop, Inc. v. United States, 870 F.2d 637, 641 (Fed. Cir. 1989). . . . . . . . . . . 13

Eagle Paving, AGBCA No. 75-156, 78-1 BCA ¶ 13,107, 1978 WL 25262 (1978). . . . . . . . . . . 15

Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986). . . . . . . . . . . . . . 14

Gardner v. Brown, 5 F.3d 1456, 1459  (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Interstate Gen. Gov't Contractors v. Stone, 980 F.2d 1433 (Fed. Cir. 1992). . . . . . . . . . . . . . . . 14

Interwest Constr. v. Brown, 29 F.3d 611, 614 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 15

Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . 16, 17

Metric Constructors, Inc., v. National Aeronautic & Space Admin.,
169 F.3d 747, 751 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Murakami v. United States, 398 F.3d 1342, 1351-52 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . 10

NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . 16

Pacific Insurance Co. v. Eaton Vance Management, 369 Fed. 3d 584, 589 (1st Cir. 2004). . . . . . . 9

Shell Oil Company v. United States, 80 Fed. Cl. 411 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Souter Constr. Co., ENG BCA No. 5701, 03-3 BCA ¶ 26,175, 1993 WL 236561 (1993). . . . . . . 15

Sturm v. United States, 190 Ct. Cl. 691, 697 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tex. Atty. Gen. Op. GA-0408 (Mar. 2, 2006), 2006 WL 519143. . . . . . . . . . . . . . . . . . . . . . . . . 18

Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 6

West Bay Builders, Inc. v. United States, 85 Fed. Cl. 1, 16 (2008).. . . . . . . . . . . . . . . . . . . . . . . . 15

WPC Enters., Inc. v. United States, 163 Ct. Cl. 1, 5-6 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . 15


## FEDERAL STATUTES

16 U.S.C. § 472a(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim


## FEDERAL REGULATIONS

36 C.F.R. § 223.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

36 C.F.R. 223.52(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

36 C.F.R. § 223.52(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 13

36 C.F.R. § 223.52(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 13

36 C.F.R. § 222.52(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

36 C.F.R. § 223.115(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F:\SWH\J14680.wpd

I.      **INTRODUCTION.**

Defendant attempts to paint Wyoming Sawmills as the villain for not harvesting the Wabash timber sale more promptly leading to the contract's 15-year length.  However, each and every extension Wyoming Sawmills received on the Wabash timber sale was authorized under the contract and granted by the Forest Service without objection.  Wyoming Sawmills cannot be a villain for exercising its contract rights, including its right to a Market Related Contract Term Addition ("MRCTA") under contract provision C8.212#.  Significantly, over eight years of additional time was granted by the Forest Service so that Wyoming Sawmills could harvest salvage sales for the Forest Service that the agency determined were in more urgent need of removal than the Wabash sale.  Plaintiff's Exhibit ("Pl. Ex.") B.[1]  The Wabash sale was extended beyond 10 years by the Forest Service because better utilization of forest resources would result from completion of the Black Hawk Timber Sale.  Declaration of Ernest W. Schmidt, Dkt. 19, Ex. 2 at 10.  Given the fact that the contract term would <u>not</u> exceed ten years "as a result of " MRCTA, under the plain language of the contract the Wabash sale was entitled to MRCTA.

Alternatively, even if the Court finds that C8.212# as applied to the facts of this case is ambiguous because the government contends "as a result of " means no subsequent MRCTA is permitted in any case where the contract term already exceeds 10 years, then there is a latent ambiguity.  That ambiguity was not evident when the contract was awarded and must be resolved against the government because Wyoming Sawmills' interpretation is reasonable.  <u>Diggins Equip. Corp. v. United States</u>, 17 Cl. Ct. 358, 360 (1989).

---

[1]      Plaintiff's Exhibit A is the entire timber sale contract attached to Plaintiff's Proposed Findings of Uncontroverted Fact, Dkt. 32.  Plaintiff's Exhibits B-I are attached to this memorandum.

1

Realizing the weakness of its argument that there is a 10-year absolute limit on contract length, defendant places great weight upon the existence of insect activity in the sale area as an alternative ground for denying MRCTA and faults Wyoming Sawmills for the insect activity in the sale area.  Wyoming Sawmills does not dispute that there has been insect activity in the sale area, but that is not the fault of Wyoming Sawmills.  Insect activity occurs throughout the entire Black Hills National Forest, not just in the sale area, and the parties contemplated that insect damage might occur, and it is addressed fully in the contract terms.  If insects cause "catastrophic damage," which the contract defines as one million board feet of timber damaged over twelve months, then the Forest Service may terminate the contract under B8.222.  Pl. Ex. A at 30, 18 (B2.133). Anything less than one million board feet of insect damage is considered "insignificant" minor damage under B2.134.  Pl. Ex. A at 18.

 As will be explained below, the Forest Service's litigation position now, that the Wabash Timber Sale was not entitled to MRCTA in 2007 because the timber was in urgent need of removal, is not supported by the undisputed facts.  There was no mention by the Contracting Officer of timber in urgent need of removal in his March and April 2007 letters denying MRCTA, Def. Ex. 16; Pl. Ex. G,  there were no measurements by the Contracting Officer in 2007 to estimate the specific insect damage in the various portions of the sale, and when measurements were finally made in late 2008 in response to Wyoming Sawmills' request, there was, according to the Contracting Officer, only "minimal" damage in the remainder of the sale.  Def. Ex. 20.  Even when the Contracting Officer finally measured the insect activity in December 2008, he found there were 203 MBF of "green bug hit trees," and only "152 MBF of dead trees [ ] were killed from bug flights during previous years."  Def. Ex. 2 ¶ 20.  The 152 MBF was presumably dead in 2007 but amounted to less than 3% of the remaining 6,422 MBF sale volume.  Def. Ex. 2 ¶¶ 4-5,  20.

2

If the Court finds that the Wabash sale was entitled to MRCTA in 2007, that does not mean that the Forest Service is powerless to address future insect activity.  If there is only minor insect damage, the Forest Service can, as it did in 2006, agree with Wyoming Sawmills to delete particular units from the timber sale. Schmidt Dec., Ex. 2 at 11.[2]  If the Forest Service finds the insect activity great enough at some future point to constitute catastrophic damage under the contract, it has the power to terminate the contract.  Therefore, the Forest Service's suggestion that this Court must find that the Wabash Timber Sale was ineligible for MRCTA in 2007 in order to address insect activity in 2009 is a false choice because the contract terms already provide a mechanism to address insect activity on the sale area.  Most importantly, the risk of loss of uncut timber from insect activity is placed upon the Forest Service not Wyoming Sawmills.  See B8.11 and B8.12, Pl. Ex. A at 30  (title to timber remains in Forest Service until timber is cut and liability for insect damage is borne by the title holder).  The Forest Service is attempting to shift that risk unfairly to Wyoming Sawmills when it denied  MRCTA in 2007 without a single word about insect activity, explaining that the sole reason for denial of MRCTA was that the contract term exceeded 10 years.

---

[2]     Defendant relies on petitions and letters from adjoining landowners in 2005, urging removal of some insect infested timber in the Wabash Timber Sale area in 2005.  Def. Ex. 10-11.  A letter was directed to Wyoming Sawmills but also to the Forest Service regarding the matter.  Defendant does not include the August 17, 2005 letter to the Forest Service expressing concern that the Director of Forest Management was attempting to "force the contract" rather than negotiate a resolution that would provide for the harvest of the insect infested trees.  See Pl. Ex. I.  The landowners' August 17, 2005 letter  transmitted a letter from Wyoming Sawmills' President Ernie Schmidt and noted that "Mr. Schmidt's Proposal reflects his actions in not logging the Wabash sale were encouraged by The Forest Service [sic]."  Id.  The landowners encouraged "a settlement advantageous to both parties" and did not consider Wyoming Sawmills the villain.  Id.  After the mutual agreement to delete insect-affected units was reached in 2006 and one-third of the sale was harvested, the Forest Service points to no further letters from landowners expressing concern about insects.  Apparently, there were also no letters from concerned landowners about insects in 2007, the year the Forest Service determined the Wabash sale was not eligible for MRCTA.

II.   **BACKGROUND**.

Wyoming Sawmills agrees with defendant that "[t]he court can decide the issue of whether Wyoming [Sawmills] is entitled to MRCTA based solely upon the language of the contract." Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. Br.") at 3 n.3.   Nonetheless, defendant provides a brief history of the contract, noting that the contract was extended five times.[3]  The Forest Service notes that the contract was extended five times, three of which were for a "contract term adjustment."  However, defendant fails to  disclose the specific reason for, and the total length of, those adjustments.  Def. Br. at 3. The contract term adjustments were made because the Forest Service agreed that Wyoming Sawmills should work on salvage timber sales where the timber was already dead and in <u>urgent need of removal</u>.  These sales include the Boyd Blowdown Salvage (1.98 MMBF), Black Butte Salvage (.8 MMBF), Hazelton Salvage (.3 MMBF), Lick Salvage (4.4 MMBF), and Black Hawk Salvage (11.1MMBF).  Schmidt Dec., Ex. 2.  These sales totaled over 18 million board feet -- more than twice the volume of the 9 million board foot Wabash Timber Sale -- <u>and added 8-1/2 years to the original six-year contract term</u>.  Pl. Ex. B.  Furthermore, these timber sales for which Wyoming Sawmills earned additional time to complete the Wabash sale were also Forest Service sales, not timber sales on private land.  <u>Id.</u>  The CTA earned for work on the Black Hawk sale resulted in the termination date of the Wabash sale being modified beyond 10 years.  Schmidt Dec.,

---

[3]      Defendant contends that the contract terminated on December 20, 2008.  If the Court adopts Wyoming Sawmills' interpretation of the contract, then its termination date was adjusted by MRCTA, and it is Wyoming Sawmills' position that the contract has not terminated. Even if the Court adopts defendant's alternative position that the Forest Service could have denied MRCTA for certain sale units in need of urgent removal, then the other portions of the sale where there has been no insect deterioration are entitled to MRCTA.  C8.212# ("Additional contract time may not be granted . . . for those portions of the contract where the Contracting Officer determines that the timber is need of urgent removal, or that timber deterioration or resource damage will result from delay").

4

Ex. 2 at 10 ("the Forest Service did request the purchaser to interrupt his normal operations to harvest rapidly deteriorating timber from the Blackhawk Timber Sale and did notify the purchaser that adjustments of termination dates of his contracts could be made . . . and that a total of 45.3 months was indeed lost due to causes beyond the purchaser's control").

Further, Wyoming Sawmills did not waive its right to have the Wabash sale later qualify for MRCTA, and the MRCTA provision remained in the contract.[4]  Defendant complains that Wyoming Sawmills "now seeks to use the Forest Service's generosity against it."  Def. Br. at 13. To the contrary, the time added to the Wabash contract was not a gift but rather was time to which Wyoming Sawmills was contractually entitled and permitted Wyoming Sawmills to work on other timber sales, which were a higher priority for the Forest Service to harvest.  Under the plain meaning of the contract, given the drastic reduction in wood products prices, and the purpose of C8.212# in the contract to provide relief to the purchaser from the periodic payment and termination dates when the market declines significantly, the Wabash Timber Sale is entitled to MRCTA.

Wyoming Sawmills removed approximately one-third of the Wabash Timber Sale volume in 2006.  However, by the time of the logging season in 2007, markets had deteriorated significantly to the point where the index of wood product prices was drastically reduced.  This automatically triggered a finding of substantial overriding public interest providing for MRCTA

---

[4]     Defendant argues that the continued presence of C8.212# in the contract after the sale term was modified beyond 10 years is of no consequence because by its express language, the sale was not eligible for MRCTA once the contract exceeded 10 years.  Defendant also argues that the Forest Service does not constantly review contracts to determine which provisions are still in effect.  Def. Br. at 14.  The Forest Service does, in fact, review contracts when they are modified to determine whether its provisions need to be modified or deleted, and they did so in this very case when the Wabash sale was previously modified.  See Pl. Ex. C.  Moreover, as a rule of contract construction, no term of the contract should be read to be meaningless, and the Forest Service's interpretation renders portions of C8.212# meaningless.

for those timber purchasers who requested it.  Wyoming Sawmills was in financial straights just like other timber purchasers, and the MRCTA provision was designed to address drastic declines in the wood products markets to provide relief to timber purchasers who did not harvest enough timber to meet mid-point payments and termination dates on their uncompleted timber sales.  See 63 Fed. Reg. 24110, 24111 (May 1, 1998) (explaining that MRCTA was "for extending termination dates to prevent contract default or severe financial loss to the purchaser in response to adverse conditions in the lumber markets").

Defendant argues that the insect activity was of concern to the Forest Service and local landowners.  Def. Br. at 5.  However, it was also of concern to Wyoming Sawmills, and Wyoming Sawmills wanted to work with the Forest Service to modify or terminate the sale because of the insect damage.  Def. Ex. 11.  Wyoming Sawmills bought the Wabash Timber Sale as a healthy green sale at green sale prices, not as an insect-damaged timber sale.  However, if the Forest Service were to modify or cancel the contract because of insect damage, the contract terms provide that Wyoming Sawmills would have no further payment obligation.  B8.222, Pl. Ex. A at 30.  If the insect damage rises to the level of catastrophic damage defined by B2.133, then the Forest Service must follow contract provisions regarding modification and termination of the contract, including those addressing whether to resell "to permit salvage operations by others."  B8.22 and B8.33; Schmidt Dec. ¶¶ 19-23.  See, generally Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98 (2005) (discussing catastrophic damage provisions and risk of loss in the context of fire damaged timber).  Insect damage was contemplated under the contract terms, and if there was minor insect damage as defined by provision B2.134, the Forest Service could seek a minor adjustment to the boundaries of cutting units through mutual agreement under B2.37.  Pl. Ex. A at 30.  The Forest Service did just that in 2006 when it reached a mutual agreement to eliminate four insect affected

6

units from the sale, which totaled about a million board feet.  Schmidt Dec., Ex. 2 at 11.  In

contrast, Wyoming Sawmills removed (18 million board feet) -- 18 times as much distressed

timber which was a better utilization of resources, when it shifted harvest to accommodate the

Forest Service to work on salvage sales in more urgent need of removal under the contract term

adjustments for the Wabash sale.  Pl. Ex. B.

  The Forest Service admits that it had little interest in working with Wyoming Sawmills to

address the insect activity on the sale.  Defendant explains how Wyoming Sawmills was willing to

work with the Forest Service to release the timber, but how the Director of Forest Management

believed the government's monetary interest in receiving revenues from the sale at Wyoming

Sawmills' bid price for green timber outweighed interest in addressing the insect activity by

reselling the timber to another purchaser.  Def. Br. at 5-6.  The Forest Service's desire to exact its

financial pound of flesh from Wyoming Sawmills, rather than address the insect activity, led the

Contracting Officer to omit any reference to insect activity on the timber sale in his rationale for

refusing to grant MRCTA.  Def.'s Ex. 16.  Had the Forest Service cited insect activity as a grounds

for concluding certain portions of the sale were not eligible for MRCTA, then Wyoming Sawmills

would have no further financial responsibility for the insect affected units.  The Forest Service was

essentially trying to make an end run around the contract provision that placed the risk of financial

loss for insect damaged timber on the government.  B8.12 (risk of loss is on the Forest Service).

  Finally, Wyoming Sawmills' position that the Wabash sale is eligible for MRCTA not only

is consistent with the plain meaning of C8.212#, it is also an equitable result since there is nothing

in the contract stating that Wyoming Sawmills should be penalized for harvesting 18 million board

feet on other Forest Service timber sales that the agency wanted Wyoming Sawmills to remove

because that timber was in more urgent need of removal.  The contract relief for decline in markets

explicitly provided for by C8.212# should remain available to a purchaser whose contract exceeded 10 years because it agreed with the Forest Service to extend the termination date beyond 10 years for a reason other than MRCTA.

### III.   ARGUMENT.

A.   **The Fact That the Wabash Contract Is More than 10 Years Old Does Not Mean the Contract Is Not Entitled to MRCTA.**

Defendant argues that "Wyoming was not entitled to an MRCTA extension under section C8.212# because the Contract's term already exceeded 10 years." Def. Br. at 9. This is the same reason for denying MRCTA that the Contracting Officer cited in his March 12, 2007, letter stating that "the Wabash sale does not qualify for MRCTA under C8.212-Market-Related Contract Term Addition (5/98) as the Contract Term exceeds 10 years." Def. Ex. 16. However, the plain language of the contract, the regulation, and the statute do not support this narrow interpretation.[5]

Defendant agrees with Wyoming Sawmills that the key sentence of the contract governing MRCTA is as follows: "<u>The revised contract term may not exceed 10 years as a result of market-related contract term addition</u>." Def. Br. at 9-10 (defendant's emphasis). This plain language is at odds with defendant's interpretation of the contract, which essentially is that "MRCTA shall not be granted if the contract term already exceeds 10 years." That is not what the contract says, and for good reason. The plain meaning provides that if the contract was extended beyond 10 years for <u>some other legitimate reason</u> that was desirable to the Forest Service, the purchaser would not be penalized if market conditions deteriorated during the period of the previously granted extension.

---

[5]   Apparently acknowledging the weakness of the argument, defendant sets forth an alternative ground for refusing to grant MRCTA based on insect activity in the sale area. Def. Br. 14-15. As will be described below, the insect activity argument has no merit as a basis for refusing to grant MRCTA in 2007 when Wyoming Sawmills made its request. In any event, the insect activity does not change the plain language of the contract, that the contract term may not exceed 10 years as a result of MRCTA.

8

Defendant's strained reading of the contract language leads it to conclude that "merely because one extension causes the contract to exceed 10 years does not mean that another extension, like MRCTA, would not also cause it to exceed 10 years."  Def. Br. at 10.  Defendant's interpretation ignores that the reference to 10 years in the contract is modified by the contract language "as a result of MRCTA."  The two phrases read together create a temporal threshold that once crossed, means that later events do not "cause" the 10 year threshold to be exceeded a second time.  "As a result of" means "to cause once."

Rephrasing the plain language of the contract term "as a result of " as defendant does in its brief does not help defendant.  For example, in Shell Oil Company v. United States, 80 Fed. Cl. 411 (2008), the court interpreted the term "by reason of " in the contract provision that stated the federal government would pay any additional taxes, fees or charges imposed by the government "by reason of " the production, manufacture, sale or delivery of aviation gas ("Avgas").  Id. at 413. Plaintiff sought recovery against United States for cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), even though the contracts for aviation gas had concluded in 1943.  The court, in interpreting the contract term "by reason of," held that "it does not matter when the oil companies incurred the costs or when they were imposed; instead what matters is that the costs are actually related to performance of the Avgas Contracts." Id. at 416.  The court held that the contract "language [is] unambiguous: 'by reason of ' means 'because of.' BLACK'S LAW DICTIONARY 201 (6th ed. 1990)" (citing Pacific Insurance Co. v. Eaton Vance Management, 369 Fed. 3d 584, 589 (1st Cir. 2004)).

In this case, there is no suggestion that the contract term "as a result of " varies from is ordinary meaning. In fact, the Federal Circuit has interpreted the very phrase at issue in this litigation and has concluded that the term "as a result of " means caused by, to spring from, or arise

as a consequence of.  <u>Murakami v. United States</u>, 398 F.3d 1342, 1351-52 (Fed. Cir. 2005);

<u>Gardner v. Brown</u>, 5 F.3d 1456, 1459  (Fed. Cir. 1993).  Defendant simply cannot escape the

undisputed and plain meaning that a contract cannot exceed 10 years <u>as a result of</u> MRCTA, and

that if the contract already exceeds 10 years for another reason, MRCTA is still available.  Since

the Wabash contract would not exceed 10 years as a result of MRCTA, the contract is entitled to

MRCTA to adjust the periodic payment and termination dates.

    Defendant's brief devotes a single paragraph to the MRCTA regulation, emphasizing that

the regulation requires a finding of substantial overriding public interest for MRCTA.  Def. Br. at

11; 36 C.F.R. § 223.52(b)(3).  What defendant fails to state is that the requisite finding of

substantial overriding public interest is made automatically when there is a prolonged and drastic

decline in wood products prices.  36 C.F.R. § 223.52(b)(3) ("a determination that a drastic

reduction in wood products prices . . . has occurred <u>shall</u> constitute a finding that the substantial

overriding public interest justifies the contract term addition") (emphasis added).  Second, under

the criteria of the regulation there was a finding of substantial overriding public interest for

MRCTA.  In this case at the time Wyoming Sawmills made its request for MRCTA in 2007,

because the Forest Service Chief had made a determination that there was a drastic reduction in

wood products prices.  Schmidt Dec., Ex. 3 at 7-10.  The regulation requires the Chief to make the

determination of a drastic reduction in wood products prices if the index for wood products prices

falls significantly for two consecutive quarters relative to previous quarters.  36 C.F.R. §

223.52(b)(1).  Therefore, defendant's attempt to distinguish the MRCTA regulation is unavailing

because (1) in this case all the conditions required by the regulation occurred (triggering MRCTA

occurred since the wood products price index declined for the required number of quarters, there

was a drastic reduction in wood products prices, and a finding of substantial overriding public

10

interest), and (2) the regulation language regarding the 10-year contract term is essentially identical to the contract language.  <u>Compare</u> 36 C.F.R. § 222.52(c)(4) ("[i]n no event shall a revised contract term exceed 10 years as a result of market-related contract term additions") <u>with</u> C8.212# ("[t]he revised contract term may not exceed 10 years as a result of market-related contract term addition").  Thus, if the plain language of the contract provides that the Wabash sale is eligible for MRCTA, then the regulation with identical language leads to the same result.

The National Forest Management Act also does not save defendant.  16 U.S.C. 472a(c).  While defendant underlines the phrase in the statute that "sales contracts shall be for a period not to exceed 10 years," Def. Br. at 12, the statute goes on to say that "such period may be adjusted at the discretion of the Secretary to provide additional time due to time delays caused by an act of an agent of the United States or by other circumstances beyond the control of purchaser . . . . the Secretary shall not extend any contract period with an original term of 2 years unless he finds (A) that the purchaser has diligently performed in accordance with an approved plan of operations <u>or</u> (B) that the substantial overriding public interest justifies the extension."  16 U.S.C. § 472a(c) (emphasis added).[6]  The agency Forest Service regulation, 36 C.F.R. § 223.31, mirrors the statute.  Defendant completely ignores the agency's published statements in the Federal Register explaining how NFMA Section 472a(c) is interpreted in the context of the MRCTA regulation.  The Chief of the Forest Service has explained that a drastic reduction in wood products prices <u>constitutes the substantial overriding interest finding in NFMA</u>.  The Federal Register explains:

> That the 1990 [MRCTA] rule [promulgated by the Secretary of Agriculture] provides that if there is a drastic decline in wood products prices sufficient to trigger the market-related contract term addition, there would be a corollary substantial overriding public interest to extend the term of existing

_____

[6]      The Forest Service concluded that better utilization of forest resources would result when the Wabash sale was adjusted beyond 10 years to permit removal of timber in urgent need of removal on the Black Hawk sale.

> timber sale contracts, as required by the National Forest Management Act of
> 1976 (16 U.S.C. § 472a(c)) and existing regulations at 36 C.F.R. §
> 223.115(b).

61 Fed. Reg. 54589, 54590 (Oct. 21, 1996).  When the Department of Agriculture revised the wood

products index to be used as a basis for triggering MRCTA, the Deputy Undersecretary again

emphasized that the criteria in the MRCTA regulation satisfied the requirements in 16 U.S.C. §

472a(c).  The Federal Register stated:

> that the existing wood products price index rather than an additional wood
> chip index, was sufficient to meet "the 'substantial overriding public
> interest' standard required by the National Forest Management Act (16
> U.S.C. § 472a(c)).  Substantial overriding public interest has been
> determined to exist when the criteria in the regulation have been met.  When
> the criteria in the regulation have been met, there is a disruption of the
> economy that may result in loss of industry and jobs.  If more than one index
> is used for granting extensions on timber sale contracts, it is unlikely that
> this criteria for substantial overriding public interest would be met."

63 Fed. Reg. 24110, 24112 (May 1, 1998) (parenthetical in original).

Thus, the Forest Service equates a drastic reduction in the wood product price index under

the MRCTA criteria as a finding of substantial overriding public interest under NFMA to provide

purchasers more time to complete the timber sales.  The public interest in providing purchaser

more time to complete financially burdensome timber sale contracts following drastic market

declines was affirmed by the Secretary of Agriculture when the MRCTA was adopted.  The

Secretary stated:

> a contract term addition would help avoid financial hardship on purchasers
> and ensure that the federal government will receive payments due from
> purchasers by reducing the likelihood of default.  Second, by reducing the
> likelihood of default, a contract term addition would help ensure that
> receipts to States and counties from timber sales are not adversely affected.
> Additionally, contract term addition would help promote stability in the
> wood products industry.  This in turn would help ensure community
> stability, competition, employment, investment, productivity, innovation and
> the ability of United States-based enterprises to compete with foreign-based
> enterprises in both domestic and export markets.

55 Fed. Reg. 50643 (Dec. 7, 1990).[7]

To the extent defendant is arguing that the plain language of the contract provision C8.212#

conflicts with the statute and therefore should not be applied, it is mistaken.  First, the contracting

parties can agree to vary and even waive a statutory term so long as Congress itself has not

expressed an intention to preclude waiver.  Do-Well Machine Shop, Inc. v. United States, 870 F.2d

637, 641 (Fed. Cir. 1989).  Second, the National Forest Management Act statutory language

regarding 10 year contract length itself is not absolute.  Instead it provides for adjustment based on

"delays caused by an act of an agent of the United States or by other circumstances beyond the

control of the purchaser."  16 U.S.C. § 472a(c).[8]

---

[7]     The substantially overriding public interest finding was supported by letters, which the Contracting Officer encouraged Wyoming Sawmills to obtain from public officials supporting MRCTA for the timber sale.  Schmidt Dec., Ex. 8.  In addition to the public benefit, extensions of payment termination deadlines provide "Government benefits if defaulted timber sale contracts, mill closures and bankruptcies can be avoided by granting extensions . . . . In addition by extending contracts and avoiding defaults, closures and bankruptcies, the Government avoids a difficult, lengthy, expensive, and sometimes impossible, process of collecting default damages."  71 Fed. Reg. 66160, 66162 (Nov. 13, 2006).

[8]     The government notes that the Forest Service issued a determination of substantial overriding public interest in the September 17, 2008 Federal Register, stating that MRCTA could be applied to allow certain contracts to exceed 10 years.  73 Fed. Reg. 53817 (Sept. 17, 2008).  Fed. Br. at 12 n.6.  Defendant apparently suggests that a separate finding of substantial overriding public interest was needed for the Wabash sale.  However, the Wabash sale already exceeded 10 years, and the September 2008 determination of substantial overriding public interest is unnecessary because the Forest Service had already made the quarterly substantial overriding public interest finding under the MRCTA regulation in 2007 based on the same data and lumber price index.  36 C.F.R. 223.52(b)(1) (stating that "the Forest Service shall monitor and use only the following indices . . . Softwood Lumber . . . 0811. "); see also 73 Fed. Reg. 53817, 43818, 53820 (Sept. 17, 2008) (referring to the same softwood lumber index 0811).  There are not separate definitions of substantial overriding public interest.  Thus, the Forest Service had the authority to provide MRCTA to the Wabash sale in 2007 based on the automatic finding of substantial overriding public interest that occurred then.  36 C.F.R. 223.52(b)(3).

F:\SWHJ14680.wpd

**B.      Alternatively, As Applied, the MRCTA Contract Provision Contains a Latent Ambiguity and Should be Construed Against Defendant**.

Defendant argues that Wyoming Sawmills' interpretation leaves the contract term meaningless.  Def. Br. at 13.  However, Wyoming Sawmills' interpretation is the *only* interpretation that actually harmonizes the statute with the contract and the facts of this case.  Defendant claims that the provision at issue is clear on its face and unambiguous.  Yet, if the contract provision had sufficient clarity regarding whether Wyoming Sawmills qualifies for an extension, the parties would not be in litigation.  Given the interpretation advanced by the government as applied to the facts, the contract is susceptible to more than one interpretation.  As explained below, to the extent defendant insists on an interpretation that contradicts the plain language, the contract contains a latent ambiguity that should be resolved against defendant.

When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity.  Metric Constructors, Inc., v. National Aeronautic & Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999).  Stated another way, if more than one meaning is reasonably consistent with the contract language, it cannot be deemed "unambiguous."  Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986).  In determining whether an ambiguity is patent and obvious or latent and not easily discoverable is made on a case-by-case basis, because it is dependent on an analysis of the specific facts of each contractual situation.  Interstate Gen. Gov't Contractors v. Stone, 980 F.2d 1433 (Fed. Cir. 1992).

"[A] latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable or customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.' " Diggins Equip. Corp. v. United States, 17 Cl. Ct. 358, 360 (1989) (quoting Avedon Corp. v. United States, 15 Cl. Ct.

771, 777 (1988)).[9]  Although government contractors should be obligated to notice and bring to the

government's attention major discrepancies or errors reflecting patent ambiguities, "they are not

expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are

protected if they innocently construe in their own favor an ambiguity equally susceptible to another

construction." Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 496-97 (1965).

A latent ambiguity "arises only once the contract is applied," West Bay Builders, Inc. v.

United States, 85 Fed. Cl. 1, 16 (2008), and generally becomes evident when, "considered in light

of the objective circumstances, two conflicting interpretations appear reasonable." Id. Where a

latent ambiguity is not open or glaring, it should be construed against the government who drafted

the provision.  See Sturm v. United States, 190 Ct. Cl. 691, 697 (1970).  "[T]he basic precept is

that ambiguities in contracts drawn by the government are construed against the drafter." Id.

Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 496-97 (1965).

The only requirement is that the contractor's proposed interpretation of the latent ambiguity

be reasonable.  Community Heating & Plumbing v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993).

In resolving conflicting interpretations, the Court is called to choose among conflicting, reasonable

interpretations.  Thus, both parties must show that their interpretation falls within a zone of

reasonableness to be considered.  WPC Enters., Inc. v. United States, 163 Ct. Cl. 1, 5-6 (1963).

The reasonableness of a contractor's proffered interpretation may be proved a variety of ways,

including by showing that other contractors had the same interpretation, see Eagle Paving, AGBCA

No. 75-156, 78-1 BCA ¶ 13,107, 1978 WL 25262 (1978) or by showing that the government's

---

[9]    Interwest Constr. v. Brown, 29 F.3d 611, 614 (Fed. Cir. 1994) ("If we conclude
that the contract language was ambiguous, we must then determine whether that ambiguity was
patent so as to impose a duty to seek clarification, or only latent.").

F:\SWHJ14680.wpd

interpretation is inherently unfair and should be rejected as unreasonable.  See Souter Constr. Co.,
ENG BCA No. 5701, 93-3 BCA ¶ 26,175, 1993 WL 236561 (1993).

Significantly, the non-drafting party's interpretation need not be preferable but only within
the zone of reasonableness.  NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir.
2004).  Thus, even though the government's interpretation might arguably be more reasonable than
the contractor's interpretation, if the contractor proposes an interpretation that is reasonable, the
latent ambiguity will nonetheless be construed against the government.  Diggins Equip. Corp. v.
United States, 17 Cl. Ct. 358, 360 (1989); see also Big Chief Drilling Co. v. United States, 26 Cl.
Ct. 1276, 1299 (1992); Beta Constr. Co. v. United States, 39 Fed. Cl. 722 (1997), rev'd, 185 F.3d
884 (Fed. Cir. 1999) (concluding that if there was an ambiguity, it was latent, and that the
contractor reasonably interpreted the contract).

In the instant case, the contract was extended in excess of 10 years not because of some
MRCTA extension, but because of separate CTA extensions for the benefit of the government.
The specific extension causing the term to exceed 10 years was because the Forest Service believed
better utilization of timber would result by Wyoming Sawmills' work on the Black Hawk Timber
Sale, which was a salvage sale in urgent need of removal.[10]  Thus, the contract term initially
exceeded 10 years "as a result of" the CTA extension, not "as a result of" MRCTA.  It is precisely
for this reason that as applied, if one were to accept the government's proffered interpretation, the

---

[10]  Defendant is incorrect in asserting that there was never a finding that extending the
contract beyond 10 years would result in better utilization of forest resources.  The Wabash
timber sale was extended beyond 10 years for that very reason – to assist the Forest Service
on the Black Hawk salvage sale.  In consideration for Wyoming Sawmills' agreement to work on
the Black Hawk sale, the Forest Service agreed to provide five more years to complete the
Wabash Timber Sale.  Pl. Facts §§ 10-11; Schmidt Dec. Ex. 2 at 9-10.  Now the Forest Service is
penalizing Wyoming Sawmills for the time spent on the Black Hawk salvage sale.

contract term regarding MRCTA extensions either renders the phrase "as a result of" meaningless, or contains a latent ambiguity.[11]

Wyoming Sawmills is in a unique situation of seeking an MRCTA extension after a series of CTA extensions granted for the benefit of the government to harvest timber in more urgent need of removal had already caused the term to exceed 10 years. Wyoming Sawmills' interpretation is the only proposed interpretation that actually gives effect to the entire phrase, "[t]he revised contract term may not exceed ten years *as a result of* market-related contract term addition." Had the government wanted to make clear that the phrase actually created a 10-year ceiling on contract terms regardless of individual situations and reasons for various extensions, it should have drafted the phrase differently. For example, the provision could have made clear that an MRCTA "will not be granted if any portion of the MRCTA extension will be performed beyond 10 years from the date of award."

Obviously, the latent ambiguity, if there is one, is revealed *only* because of a unique situation in combination with the government's unfair narrow interpretation. The 10-year term was undeniably exceeded "as a result of" a CTA extension given to assist the Forest Service with a salvage sale. And once that 10-year threshold was exceeded, it could not be exceeded again. Defendant's interpretation misreads the phrase "as a result of" by omitting any element of causation. Plainly, use of the phrase "as a result of" contemplates that MRTCA would *cause* the 10-year term to be exceeded. By analogy, Greg Abbott, the Attorney General of Texas recently issued an Opinion Letter, which interpreted the state Tax Code in exactly the same way – a tax code provision allowed municipal hotel taxes, but not if the tax would cause combined state,

---

[11] In interpreting a contract, the court is to read the contract as a whole and endeavor to give a reasonable meaning to all its provisions. Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000).

F:\SWHJ14680.wpd

county, and municipal taxes to "exceed 15 percent" of the overall room rate.  The Opinion

concluded that the 15 percent rate in light of the phrase "as a result of" reflected a causation

component, which meant that the ceiling could only be exceeded *once*.[12]

Morever, in January 2002, Megan Timoney, the Timber Sale Administration Group Leader

for Forest Service, Intermountain and Rocky Mountain Regions (the former Wabash Contracting

Officer) addressed the 10-year limit for MRTCA extensions.  In correspondence, Ms. Timoney also

interpreted the "as a result of" language as requiring a causation component, stating: "MRTCA's

[sic] cannot be granted on sales if it *causes* the sale to go beyond the 10 year limit – it says so right

in the provision."  (emphasis added).  Correspondence from Megan Timony to Gary Say/R2 (Jan.

15, 2002).   A copy of this e-mail is attached as Exhibit E.  Clearly, if the Contracting Officer for

defendant has interpreted the "as a result of" phrase as requiring causation, Wyoming Sawmill's

interpretation in this situation is unquestionably reasonable.

Since it was the CTA extension that caused the 10-year term to be exceeded, the

government cannot now unfairly deny Wyoming Sawmills an MRCTA under the argument that it

would "cause" the 10-year term to be exceeded a second time.  To do so renders "as a result of"

meaningless, conflicts with the Contracting Officer's interpretation of that phrase, and is unfair as

applied to these facts.  Under the circumstances, if there is an ambiguity, it is latent, and Wyoming

---

[12]      In Opinion No. GA-0408, the Attorney General of Texas interpreted Section
351.0025(b) of the Tax Code, which allows municipalities to impose hotel taxes, provided that
such a "municipality may not impose a tax if *as a result* of the adoption the combined rate of
state, county, and municipal hotel taxes . . . *exceeds 15 percent of the price of paid for the room*."
The AG concluded that this threshold is only "exceeded" once, and a county's later adopted of a
hotel tax (which causes the 15 percent ceiling to be exceeded) does not affect a municipality's
earlier adopt of its tax.  This is persuasive reasoning concerning identical interpretative terms.
See Tex. Atty. Gen. Op. GA-0408 (Mar. 2, 2006), 2006 WL 519143 (Tex. A.G.), at *3.  A copy
of this Opinion is attached as Exhibit D.

F:\SWHJ14680.wpd

Sawmills' interpretation under these unique circumstances is entirely reasonable.  Under the

doctrine of *contra proferentem*, Wyoming Sawmills should prevail.

      **C.**      **Insect Activity On the Sale Area Does Not Affect the Interpretation of the Phrase "The Revised Contract Term May Not Exceed 10 Years as a Result of MRCTA," and it Was Not a Basis to Deny Wyoming Sawmills' 2007 Request for MRCTA.**

Defendant argues that insect activity is an alternative ground for concluding that the

Wabash sale is not eligible for MRCTA.  Def. Br. at 14-15.  Wyoming Sawmills acknowledges

that there has been, and will continue to be, insect activity on the sale area.  However, the existence

of insect activity does not change the Contracting Officer's stated reason for denying MRCTA in

2007, nor does it help in interpreting the key phrase in the provision that "[t]he revised contract

term may not exceed 10 years as a result of market-related contract term addition."

The Forest Service was careful not to invoke insect damage as a reason for denying

MRCTA when Wyoming Sawmills made its request in 2007.  If the Forest Service used insect

damage to deny MRCTA, then Wyoming Sawmills would not be obligated to pay the balance of

the purchase price for any units removed from the contract for urgent removal, since the risk of

loss of timber removed from the sale due to insect damage remains with the Forest Service under

contract provisions B8.11 and B8.12.  Pl. Ex. A at 30.  The Contracting Officer's March 12, 2007

reason for denying MRCTA does not mention insects, timber in urgent need of removal,

unacceptable timber deterioration, or resource damage.  Def. Ex. 16.  On March 30, 2007

Wyoming Sawmills asked the Contracting Officer to reconsider his March 12, 2007 conclusion

that the Wabash sale was not eligible for MRCTA. Pl. Ex. F.  In particular, Wyoming Sawmills

stated, "from your letter, we conclude that your interpretation of the 10-year contract limit is the

only reason for denying our request for 2 years of MRCTA.  We ask you to confirm this

conclusion."  Pl. Ex. F at 1 (emphasis added).  Three days later on April 2, 2007, the Contracting

Officer reiterated the Forest Service's interpretation that "MRCTA is not available for a contract that already exceeds 10 years in length."  Pl. Ex. G.  The Contracting Officer's April 2, 2007, letter again <u>makes no reference at all</u> to insects, timber in urgent need of removal, unacceptable timber deterioration, or resource damage.

Wyoming Sawmills has worked with the Forest Service to modify the timber sale to eliminate contract units where there was significant insect damage and timber was in urgent need of removal.  In fact, Wyoming Sawmills did so in 2006.  Schmidt Dec., Ex. 2 at 11.  Ultimately, Wyoming Sawmills also agreed to permit the Forest Service to delete units 14, 15, 21, 22, 24, and 25 from the contract in 2009.  However, the Forest Service wants to have its cake and eat it too.  It wants the timber from the Wabash sale to resell, but it also wants the contract price for the timber agreed to by Wyoming Sawmills.  However, the contract permits mutual modification so that the Forest Service could proceed to resell timber in urgent need of removal in the future just as the parties agreed to in 2006.

The Forest Service misreads the contract and argues that if certain units of the timber sale were in urgent need of removal, then the Wabash sale is not eligible for MRCTA.  The argument fails for two reasons.  First, the original version of C8.212# contained in the Wabash contract precluded MRCTA for the <u>entire</u> timber sale if there was timber in a portion of the sale in urgent need of removal.  Pl. Ex. A at 122.  However, the original provision C8.212# was replaced with a revised provision C8.212# that stated if there were certain units in need of urgent removal in a portion of the sale, then MRCTA would <u>not</u> apply to those units, but the remainder of the contract would be eligible for MRCTA.  Def. Ex. 1, C8.212# ("Additional contract time may not be granted . . . for those portions of the contract where the Contracting Officer determines the timber is in urgent need of removal"); Schmidt Dec., Ex. 1 at 16-17.

Second, there was no timber in urgent need of removal when Wyoming Sawmills made its request for MRCTA in March 2007, since those units were deleted from the Wabash sale a year earlier in 2006.  It was not until late 2008 that the Forest Service even measured or "cruised" the timber to determine the extent of the insect activity in the sale area.  Def. Ex. 2 ¶ 19 (Contracting Officer describing December 2008 timber cruise).  The Forest Service made the measurements in response to a November 25, 2008 letter from Wyoming Sawmills, suggesting that there may be catastrophic damage on the sale area and asking the Forest Service to conduct an analysis of the extent of the insect activity, which had not been conducted in 2007 when the Forest Service refused to grant MRCTA.   Def. Ex. 19.  The Contracting Officer's response to this requested analysis concluded that prior reviews "never revealed enough change or damage to Included Timber or to other trees or projects within the Sale Area to meet the Catastrophic Damage requirement in B2.133 of more than one million board feet (MMBF) within a 12-month period." Def. Ex. 20.  The Contracting Officer went on to explain that measurements in late 2008 revealed several units which were in urgent need of removal.  Id.  However, the Contracting Officer concluded that "[d]amaged volume in the remainder of the Sale Area is minimal."

Therefore, the Forest Service's entire argument regarding its alternative grounds for not granting MRCTA rests upon its contention that there would be unacceptable timber deterioration and resource damage -- a point not mentioned at all in the Contracting Officer's 2007 letters denying MRCTA.   Defendant relies exclusively on Exhibit 2 for that conclusion.  However, Exhibit 2 is the Contracting Officer's 2009 declaration made more than a year and one-half after Wyoming Sawmills' request for MRCTA.  The declaration simply contains the conclusory statement that the extension would result in unacceptable timber deterioration and resource damage.  Def. Ex. 2, McGranahan Dec. ¶ 24.  The Contracting Officer's own declaration rebuts the

21

conclusion, since four paragraphs earlier he concludes that there was only 152 MBF of insect

affected timber prior to December 2008.  Id. ¶ 20.  The contract defines this as only minor damage,

and it was less than 3% of the remaining Wabash volume of 6,423 when Wyoming Sawmills

requested MRCTA in 2007.  Id. at ¶ 4-5.  And the Contracting Officer concluded that the

"[d]amaged volume in the remainder of the Sale Area is minimal."  Def. Ex. 20.  In any event,

none of the information in the 2009 Contracting Officer's declaration was cited as a basis for his

decision denying MRCTA in 2007.[13]  To do so now is inconsistent and an attempt at a post-hoc

rationalization that this Court should reject.

## IV.  CONCLUSION.

Wyoming Sawmills respectfully requests that the Court grant its motion for summary

judgment and hold that the Wabash timber sale contract is entitled to MRCTA.

Dated this 30th day of June, 2009.

HAGLUND KELLEY HORNGREN JONES & WILDER LLP


By:/s/ Scott W. Horngren
　　Scott W. Horngren, OSB No. 88060
　　Attorneys for Plaintiff
　　101 SW Main Street, Suite 1800
　　Portland, OR 97204
　　Phone: 503.225.0777
　　Fax: 503.225.1257
　　E-mail: horngren@hk-law.co

---

[13]　　The Contracting Officer's conclusory statement about resource damage is also undermined by the Forest Service's own Rocky Mountain Research Station which concludes that "bark beetles play important roles in the forest ecosystem health . . . . Bark beetle infestation create patches of forest that have trees of various ages, densities, species, and successional stages. This variation helps keep the forest healthy.  Pl. Ex. H.  Also, it is not clear whether thinning can stop beetle infestations, and the Forest Service explains that "[r]esearchers are also trying to determine whether practices such as forest thinning can help mitigate extensive tree mortality caused by bark beetles."  Id.

22

CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June, 2009, a copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Scott W. Horngren_____
Scott W. Horngren